## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | |
|---|---|
| JASON BONAYER and<br>GEORGE BACHIASHVILI,<br><br>       Plaintiffs,<br><br>v.<br><br>Crowd Machine, Inc.,<br>Crowd Machine SEZC,<br>Metavine, Inc.,<br>Craig Sproule,<br>James Hanley,<br>Anne Osborne,<br>Ben Gorlick,<br>Kurt Pfluger,<br>Camden Dore,<br>Roger Tichenor,<br>Charlie Shrem,<br>Bitrexx, and<br>Hitbtc,<br><br>       Defendants. | Case No.:  8:21-cv-1529 |

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiffs Jason Bonayer and George Bachiashvili, by and through their undersigned Counsel, make this Complaint for violations of Sections 10(b), 20(a), and 21(d) of the Securities and Exchange Act of 1934 (the "Exchange Act"), Securities and Exchange Commission ("SEC") Rule 10b-5; and Sections 5, 12 and 15 of the Securities Act of 1933 (the "Securities Act"), Section 10(b)(5) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and Section 5 of the

Securities Act of 1933 (the "Securities Act"), and for common law fraud under New York law. Based upon personal knowledge and upon information and belief, Plaintiffs allege as follows:

## NATURE OF THE ACTION

1. FASD In February of 2018, Charlie Shrem presented an investment offering ("the Offering") to Plaintiffs Jason Bonayer and George Bachiashvili to purchase cryptocurrency "tokens" related to the development of a startup.

2. The Offering was an investment in a software business described as a startup developing a cryptocurrency-based 'no-code' computer application referred to as "the Crowd Computer."

3. The driving force behind this Offering was Craig Sproule ("Sproule").

4. Crowd Computer software is wholly owned by "Metavine," a company founded by Sproule in 2013.

5. In November 2017, Sproule founded Crowd Machine, Inc., a Delaware corporation, and an affiliated Cayman Islands entity, Crowd Machine SEZC. (Both are referred to herein as "Crowd Machine" unless it is otherwise relevant to distinguish them.)

6. Crowd Machine was founded for the purpose of perpetually licensing Metavine Crowd Computer software and then using this license to issue an offering of

cryptocurrency tokens, first privately and then to the general public through cryptocurrency exchanges.

7.    Crowd Machine sought investment capital by the sale of tokens to the Plaintiffs – Crowd Machine Compute Tokens ("CMCT").

8.    Sproule produced and utilized a "White Paper" which he and others used to solicit the Plaintiffs to make an investment purchase of CMCT sold by Crowd Machine.  A copy of the White Paper is attached hereto and incorporated herein as **Exhibit 1**.

9.    That White Paper, and other corporate marketing materials, stated repeatedly and falsely that the Crowd Computer was already being utilized by major Fortune 500 companies, who were themselves making significant investments in the technology. These materials also represented that Crowd Machine had built a platform of global partners and was already generating revenue. This was all a deception.

10.    The White Paper and many of its specific statements were a total fabrication. Almost nothing in these materials was true. The marketing produced the illusion of a genuine software startup to perpetuate a massive investment fraud.

11.    The Startup could never have produced any of the software it claimed to be producing. It lied about the background of its founder, and it misled investors as to the very existence of functional software in order to induce them to invest. No functional software ever existed.

12.     Defendants' White Paper and related investment materials indicated a private sale of CMCT tokens would start in early April 2018, and a public sale of CMCT would commence shortly thereafter.  Sales of tokens to the general public commenced on April 26, 2018.

13.     At this point, Crowd Machine was marketing tokens to the general public internationally through the issuance and placement of tokens on unregistered foreign exchanges to lure more investors and speculators to purchase tokens.

14.     At this time, and at all times until the present, Crowd Machine has never had a functional product, or anything that resembles a legitimate source of revenue. The token issuance, first to the Plaintiffs, and then to the entire world through placement on foreign unregulated exchanges, was and continues to be a giant Ponzi scheme, rather than a genuine failed startup company.

15.     The Defendants admitted the tokens were a security but did not register the Offering as a security for public sale with the Securities Exchange Commission.  Under SEC cryptocurrency regulations, CMCT was required to be registered as a security if it was not otherwise exempt. Crowd Machine stated it deemed "the SAFT to be a security." It stated an intent to sell these securities on public exchanges, knowing that it was prohibited for cryptocurrency to be publicly listed without registration and it did so anyway, albeit on foreign exchanges beyond the immediate purview of the SEC and U.S. regulators.

16.    The Defendants Crowd Machine and Sproule knowingly and surreptitiously used third parties, Roger Tichenor and Charlie Shrem, also named Defendants herein, to offer investment in Crowd Machine to as many other investors as possible including Plaintiffs Jason Bonayer and George Bachiashvili.

17.    Charlie Shrem ("Shrem") solicited Plaintiff Bachiashvili for an investment into Crowd Machine. On February 13, 2018, Plaintiff Bachiashvili then directly sent Shrem cryptocurrency worth $2,112,000, without signing any formal written contract with Shrem or anyone else, to purchase tokens from Crowd Machine.

18.    Shrem took receipt of these funds by way of cryptocurrency called "Ethereum". The Plaintiff sent 2500 Ethereum to a personal wallet identification number which Shrem provided. The wallet identification number Shrem provided was 42 characters long, ending in 4a1f36.

19.    Completely unbeknownst to Plaintiff Bachiashvili, Roger Tichenor was party to and helped facilitate this arrangement by signing a "Simple Agreement for Future Tokens" ("SAFT") contract with Sproule. Tichenor and Sproule signed a contract on February 9, 2018 for 8301 Ethereum, worth approximately $7,329,000. Tichenor was a Strawman for Shrem. Shrem was not a signatory to this contract, but he coordinated with Roger Tichenor and Sproule to facilitate this arrangement. In doing so, Shrem and Tichenor participated in the Crowd Machine fraud alleged herein.

20.     Shrem then transmitted, or assisted Crowd Machine with transmitting, CMCT tokens to Plaintiff Bachiashvili.

21.     Approximately one month after Plaintiff Bachiashvili received his CMCT tokens, Crowd Machine listed its own CMCT tokens for sale and trading on cryptocurrency exchanges listed in the Seychelles, Bittrex and HitBtc cryptocurrency exchanges.

22.     As Crowd Machine never had any functional software, no functional business, and comprised substantially a Ponzi scheme, the price of CMCT promptly plummeted to near zero, rendering the investment worthless.

23.     In an effort to claw back some his existing losses, Plaintiff Bachiashvili bought additional tokens sold by Crowd Machine directly through Bittrex and HitBtc exchanges, compounding his losses by a further 928 bitcoin. Plaintiff Bachiashvili now owns more than 72 million CMCT tokens. They are completely worthless.

24.     No business model of Crowd Machine has ever launched, nor could it ever launch, nor is it in actual use by any entity. Crowd Machine is now a defunct, shuttered company, with no product ever having been created and no business operations other than expenditures on lawyers to abscond with what is left of their investors' funds.

25.     Nearly two years after having raised over $30,000,000 worth of investment money, Crowd Machine has never shown a sincere attempt at creating a product, and

only demonstrated that Crowd Machine was a fraud to sell cryptocurrency tokens, which could never have had any use other than as an instrument to fleece investors.

26.     Craig Sproule knew that all this was the case when he offered Crowd Machine tokens for sale. Charlie Shrem and Roger Tichenor helped perpetuate this fraud.

27.     As a result of the above, Plaintiff Bachiashvili is entitled to the losses he incurred on his original investment as well as losses on his subsequent purchase of CMCT on foreign exchanges.

28.     In addition to this above-alleged fraud, Defendant Crowd Machine signed a SAFT contract directly with Plaintiff Jason Bonayer for $125,000 of investment.

29.      Plaintiff Bonayer relied on the very same White Paper published by the Crowd Machine issuers and subsequently invested $125,000 on February 16, 2018. He has lost this entire amount of investment as a result.

## THE PARTIES

30.     Bachiashvili ("Bachiashvili") is a citizen of the country of Georgia and a resident of Tblisi, Georgia.

31.     Jason Bonayer ("Bonayer") is a U.S. citizen residing in New York, NY.

32.     Defendant Crowd Machine, Inc. is a Delaware-based  corporation with its business located at 2001 Gateway Place, Suite 330E, San Jose, CA 95110 .

33.     Defendant Crowd Machine SEZC is a Special Economic Zone corporation based in the Cayman Islands, with a business address of 236 Britcay House, Eastern Avenue, George Town, Grand Cayman, Cayman Islands.

34.     Defendant Metavine, Inc. is a Delaware-based corporation with the same San Jose business address as Crowd Machine Inc. Metavine is the parent company of Crowd Machine Inc. It was formed by Sproule in 2013 and  had previously been registered under the name "Wasp Software,  Inc."

35.     Defendant Craig Sproule is an Australian citizen residing in San Jose, California.  Sproule is the founder of Metavine, Inc., and of Crowd Machine.  He is CEO of both Metavine and Crowd Machine, Inc.

36.     Defendant James Hanley is a U.S. citizen. His residence is not yet determined.  He is now CEO of Metavine-Crowd  Machine.

37.     Defendant Anne Osborne is a U.S. citizen. Her residence is not yet determined.  She is comptroller for Metavine-Crowd  Machine.

38.     Defendant Ben Gorlick is a U.S. citizen. His residence is not yet determined.   He was   CTO of Metavine-Crowd Machine during the period relevant to this Complaint.

39.     Defendant Kurt Pfluger is a U.S. citizen residing in the San Francisco Bay area of California.  He was Chief Strategy Officer of Crowd  Machine Inc. during the period relevant to this Complaint

8

40.     Defendant Camden Dore is a U.S. citizen residing in Houston, Texas. He was Vice President of  Economics for Crowd  Machine during the period relevant to this Complaint.

41.     Charlie Shrem is a U.S. citizen.. Upon information and belief, he resides in Florida.

42.     Roger Tichenor is a U.S. citizen. Upon information and belief, he resides at 5262 Celedon Court, Sarasota, Florida 34338.

43.     Bittrex is a cryptocurrency exchange based in the Seychelles.

44.     HitBtc, Hit Tech Solutions Development Ltd., is a cryptocurrency exchange based in the Seychelles.

## JURISDICTION AND VENUE

45.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question), Section 22 of the Securities Act of 1933 (15 U.S.C. § 77v), and Section 27 of the Securities and Exchange Act of 1934 (15 U.S.C. §§ 78u(e) and 78aa).  It has supplemental jurisdiction over related state claims under 28 U.S.C. § 1367.

46.     Venue is proper in this district under 28 U.S.C. § 1391(b)(3) as the suit arises out of or relates to the Defendants' contacts with the United States and the State of Florida.

## FACTS

### Background:  Craig Sproule and Metavine

47.     In 2013, Craig Sproule made his debut in Silicon Valley, declaring himself to be an experienced programmer from Australia present in San Jose to raise money.  He claimed to be a software engineer with extensive experience in software systems integration.

48.     At that time Craig Sproule incorporated Metavine Inc., in Delaware. He registered documentation qualifying it to do business in California under the name Wasp Software Inc. at 200 North Almaden Blvd,  Suite 250, San Jose, Ca 95110. He was listed as president and CEO.

49.     Metavine, Inc. advertised itself as a startup providing cloud-based software, and set out to raise money from investors. Upon information and belief, Sproule raised approximately one million dollars of equity investment from unknown sources shortly after 2013.

50.     On December 19 , 2014, Wasp Software Inc., was sued by Boss Technology LLC and John Burke for fraudulently marketing BX10 software under a different company name in 2013 and rebranding it as Metavine software. This case against Wasp and Craig Sproule,  Gordon Tucker and the Operators fund, was dismissed, and in July 2015, Craig Sproule officially renamed Wasp Software Inc., Metavine , Inc., in the State of California.

51.     Metavine claimed to focus on creation of software that would permit individuals to develop applications without use of code. Despite numerous claims about its software, Metavine has never shown a working or even prototype stage software product to the public.

52.     Metavine advertised that it had contracts with numerous Fortune 500 companies. Upon information and belief, Metavine has no such contracts. It may have had a single contract with Anthem, a healthcare software company. The nature of this contractual relationship is uncertain.

### Crowd Machine and the White Paper

53.     In November of 2017, Sproule launched Crowd Machine, Inc.  Crowd Machine is a Delaware corporation.  It is a wholly owned subsidiary of Metavine and shares the same San Jose business address.

54.     Crowd Machine Inc. advertised itself as a startup in the cloud computing sector by way of numerous online materials, a Telegram instant message group channel ( since erased and scrubbed from the internet) and, finally, their White Paper.

55.     The Crowd Machine White Paper explained that Crowd Machine was intended to build on the Metavine 'no-code' concept by marrying it to a peer-to-peer cloud network -- the "Crowd Computer" concept. It explained further that

Metavine intellectual property is licensed exclusively and perpetually to Crowd Machine, its wholly owned subsidiary.

56.    Crowd Machine was advertised to investors as having the capability and possibility to compete with public cloud services – such as Amazon Web Services or Google – and with Enterprise Software Vendors, without using computer code.

57.    Upon information and belief, Crowd Machine had never once produced a demonstration of any of its software or capabilities to a public or private audience.

58.    The White Paper is full of the gibberish technobabble which is typical of cryptocurrency startup offering, It also contained deceptive statements that were intended to deceive investors into relying upon them for the purpose of deciding to make an investment.

59.    These statements include:

✦    "The crowd machine technology is in production with numerous fortune 500 companies including General Electric , Anthem, AON Hewitt, KONE and a number of large banking institutions."

✦    "Crowd Machine has already tested its technology with Fortune 500 companies such as General Electric ,  AON Hewitt, KONE , Anthem, and is already generating revenue."

✦      "The first version of the Crowd App Studio and Crowd Virtual Machine were released to market in 2017. The first version of the Crowd App Studio and Crowd Virtual Machine were released to market in 2017."

✦      "The initial research and development work , and the creation and testing of the technology has been completed by Metavine (which has perpetually licensed its intellectual property to Crowd Machine ) and is delivered to the blockchain and decentralized app community."

60.    Metavine software was entirely worthless and dysfunctional, if it even existed at all. No software technology had been 'completed by Metavine." To date, there is no public evidence this software, in any meaningful state of working development, ever existed to begin with.  To the contrary, Metavine's deception indicates they took efforts to mask over that software functions and applications had been built, when they hadn't.

61.    The Plaintiffs had seen these marketing materials and relied on them for making their decisions to invest in Crowd Machine. As a result, they sustained their losses.

**Private, Pre-sale Offerings**

62.    Crowd Machine has two distinct corporate forms:  Crowd Machine, Inc., a Delaware C-corporation, (CM USA  and Crowd Machine SEZC (CMZ), a corporation formed in the Cayman Islands.

63.     At all times, all Crowd Machine business operations, apart from investment solicitation itself, were admitted by Crowd Machine to originate and occur within the United States.

64.     Crowd Machine offered private, 'pre-sale' offerings of its CMCT tokens in early August 2018.  The pre-sale was to be offered by CM USA; a projected, subsequent public sale was to be handled by CMZ by way of listing the token on  global crypto-currency exchanges Bittrex and Hitbtc located in the Seychelles. This listing would enable crowd machine and others to unload their tokens on unsuspecting investors.

65.     Crowd Machine corporate materials and White Paper indicate the offering was clearly intended to develop a secondary market in which discount private-purchasers could make a profit by selling to the general public.

66.     Metavine and its subsidiary Crowd Machine operate out of the United States, where unregistered issuance of cryptocurrency tokens is prohibited.

67.     CMZ was created exclusively for the purpose of evading U.S. securities laws with respect to selling cryptocurrency tokens to U.S. investors who would buy the tokens and then sell them on the public market, offshore. It has no other function.

68.     There was a fixed supply of tokens, which, according to a document labeled "General Investor Information -  Private Sale Investors," would likely

produce appreciation in token value.  This document also stated it was "expected" a secondary token market would develop.   A pricing model was presented, estimating possible future token value at "at between $10- $600." Private pre-sale investors were to receive a substantial discount.

69.    The Private Sales investor document stated, at p. 11:

> MCTs are a utilitarian token, meaning that its distribution shouldn't be restricted to a lock up period, typically the case with securities under Reg D (Securities Act).While we deem the SAFT to be a security, the underlying tokens themselves are a good or service (in the form of a voucher for redemption). It also stated investors would be able to readily liquidate their tokens as "SAFT investors provide investment (as a security) for the purposes of obtaining a significant ROI."

70.    A revised, "Sales Structure Private Sales Investors" document set forth a detailed private and public sales schedule.  Crowd Machine publicly listed its token for sale on  exchanges in April 2018.

71.    Crowd Machine was a typical fraudulent cryptocurrency offering that sold private investors the legal fantasy they could unload unregistered securities to offshore exchanges.

72.    Crowd Machine listed its tokens for sale on exchanges a mere two months after taking investors' money, without having any product or software token-accessible platform behind its 'utilitarian token' pitch. They were listing tokens that had no utility on exchanges.

73.    Crowd Machine never could have had such a software platform since it was a fraud from the start.

74.    The tokens were to be sold using a "Simple Agreement for Future Tokens," or SAFT, contract. The private sale investors document refers to these SAFTs as "investment contracts for future delivery of CMCTs."

75.    The SAFT contract utilized by Crowd Machine stated: "The Offer and Sale of This Saft Has Not Been Registered Under the U.S. Securities Act of 1933, As Amended (The "Securities Act").  It required delivery of tokens to the purchaser upon product launch or upon termination of the SAFT, which would occur upon either the issuance of tokens or dissolution.

76.    On February 12, 2018, Crowd Machine filed a Form D Notice of Exempt Offering of Securities with the SEC. On February 12, 2018, Defendant Crowd Machine filed with the SEC a Form D Notice of Exempt Offering.  It indicated in that Form that it had already sold $4,500,000 to 11 investors with a plan to pay 6% to future registered Brokers

77.    On March 9, 2018  Metavine filed with the SEC that they had recruited eight investors to invest five and a half million dollars into Metavine Equity since the first investment was made in 2015.

78.    Upon information and belief, Crowd Machine raised approximately $34,000,000 worth of funds from investors , both accredited and unaccredited,

including funds taken from their own employees and from advisors and pooling agents.

## Plaintiffs' Token Investments

79.     Plaintiff Bachiashvili purchased CMCT tokens on February 13, 2018 for a price of $2,112,000.  As set forth above in ¶¶ 17-20, Plaintiff Bachiashvili sent his investment funds through Charlie Shrem, never having direct dealings with Craig Sproule or anyone at Crowd Machine. Charlie Shrem told Bachiashvili that he has invested these funds into Crowd Machine and the Plaintiff later received these tokens.

80.     Plaintiff Jason Bonayer purchased $125,000 worth of CMCT tokens. He executed a SAFT on February 16, 2018, and transferred the funds to Crowd Machine the next day.  In the course of executing the SAFT contract, Bonayer communicated with Defendants Craig Sproule, Kurt Pfluger and Camden Dore. He followed their direction as to how to execute the investment. He provided his documentation to these individuals, sent his payment to an address provided by them and confirmed his payment to them.  Craig Sproule countersigned the SAFT. Bonayer later received his tokens upon communication with both Craig Sproule and Camden Dore.

81.     By email of February 19, 2018, Plaintiff Bonayer asked Craig Sproule what the "next steps" were.   Sproule responded that the tokens would be distributed to purchasers' "wallets" during the week of April 2, 2018.

82.     Jason Bonayer remains in possession of his tokens, which are now worthless. Plaintiff  Bachiashvili also remains in possession of his tokens which are now also worthless.

83.     At some point prior to April 2018, Crowd Machine took steps to have CMCT tokens listed on numerous exchanges. CMCT tokens were listed on public exchanges to be bought and sold by the general public beginning April 2018.

84.     The tokens began selling at an extremely low price. Plaintiff Bachiashvili was so distraught he attempted to claw back losses by purchasing even more tokens on the open market from Bitrexx and HitBtc exchanges. In mid 2018, he bought 928 Bitcoin worth of CMCT Tokens on these exchanges and he holds them to this day. They are illiquid and completely worthless.

85.     Having sustained heavy losses from both his initial investment and his subsequent purchase of tokens, Plaintiff Bachiashvili reached out to Charlie Shrem in early 2019 seeking legal redress.

86.     In response to this request,  Charlie Shrem wrote via email on January 18, 2019 "We have a large group that wants to take legal action against Crowd Machine. Do you have a few minutes this week to chat ?"

87.     In the time since then, however, Shrem refused to cooperate with the Plaintiff. He also disclosed that the investment Plaintiff Bachiashvili had made had actually gone through another third party, Roger Tichenor, who has signed a SAFT as a "managing member" with Sproule. The SAFT was for an investment of 8301 ETH with Craig Sproule.

88.     Upon information and belief, Charlie Shrem brokered or underwrote all 8301 ETH, using a strawman or other entity, to sign the SAFT, such as with Roger Tichenor personally signing his name on the Crowd Machine investment contract.

89.     The SAFT related to Plaintiff Bachiashvili's investment was dated February 9th  2018, a full five days prior to the purchase of the tokens by Plaintiff Bachiashvili from Charlie Shrem.

90.     This SAFT contains a purchaser representation that the Purchaser must not sell any interest in the SAFT to anyone else.  However, upon information and belief, Craig Sproule not only knew that Charlie Shrem were reselling tokens to investors but he was providing Shrem with commissions or other incentive-based compensation to do so.

91.     Upon information and belief, Sproule engaged in a typical and notorious practice by using "advisory agreements" in which he signed side agreements with unregistered underwriters such as Shrem to disguise the

commissions he would pay them. These side deals were cloaked as "consulting fees" to provide further legal cover for the fiction that these intermediaries were something other than unregistered brokers and placement agents.

92.     Neither Roger Tichenor , Nor Charlie Shrem personally invested upwards  of 8301 Ethereum worth approximately $7.1 Million dollars on February 9, 2018. This accounted for approximately 25% of the entire Crown Machine issuance.

93.     They were underwriters investing on others behalf.

94.     Upon information and belief, they continue to have secretive contractual relationships with Crowd Machine containing punitive confidentiality provisions operating,  essentially, as gag orders signed with Craig Sproule to protect Sproule from allegations of fraud.

95.     On February 12, 2018, Crowd Machine filed with the SEC a Form D indicating it had sold $4,500,000 to 11 investors with a plan to pay 6% to future registered brokers, Crowd Machine was filing false numbers and already knowingly working with unregistered brokers.

96.     Craig Sproule was using Roger Tichenor and Charlie Shrem to broker tokens, while having them sign SAFT documentation that explicitly prohibited the very act of brokering Sproule was profiting from.

97.    The SAFT further requires the signatories to bind themselves to arbitrate rather than litigate their claims. The SAFT documentation was thus knowingly and intentionally fraudulent, and was set as a trap for signatories to the SAFT with the expectation that Crowd Machine would sell tokens to investors who would resell them privately, and then have no recourse in court, due to binding arbitration. Thus, Crowd Machine specifically induced investors to sign this arbitration clause, with the intent to prevent unregistered brokers from suing the company once the fraud was discovered. As a result of this trap, Sproule can attempt to force Charlie Shrem, Roger Tichenor and other similarly situated parties into arbitration, then claim to the arbitrators that these brokers have little to no direct losses as a result of their brokering activities, leaving them liable to the ultimate purchasers, such as the Plaintiffs herein.

98.    In this manner, the Binding Arbitration Agreements are part of a deliberate plot by Crowd Machine to dump liability for their fraud on unregistered brokers and placement agents, while being able to keep the profits of its investment fraud.

99.    Plaintiff George Bachiashvili is not a signatory to the SAFT but it was Craig Sproule and Crowd Machine's express purpose to have his tokens distributed to as many addresses as possible. Craig Sproule did not lockup his tokens. He enabled Charlie Shrem and Roger Tichenor to distribute CMCT tokens

21

to over 50 wallet addresses from the original SAFT wallet into which CMCT tokens were originally distributed.

100.    Upon information and belief, Crowd Machine and Craig Sproule knew about these transactions, and awarded Charlie Shrem a commission for brokering the investment into Crowd Machine. Roger Tichenor (together possibly with Jeffery Bahnsen), had himself incorporated "Crypto Insider Management, LLC" only weeks before signing the SAFT. "Crypto Insider Management, LLC" has since been dissolved.

## Failure to Launch

101.    Crowd Machine Inc. listed its core team on its website. The team included  Ben Gorlick as the Chief Technology Officer, Kurt Pfluger as the Chief Strategy Officer and James Duchenne as the Chief Operating Officer. All of these persons were instrumental in the marketing and legitimization of the Crowd Machine offering.

102.    At some point in mid-2018, both Ben Gorlick and Kurt Pfluger quit the company. Thereafter, Craig Sproule replaced James Duchenne with James Hanley as acting CEO of both Metavine and Crowd Machine.  Meanwhile, at some point prior to 2020, He appointed Anne Osborne as CFO of Metavine. James Hanley and Anne Osborne had taken controlling executive positions of Metavine, which wholly owned and controlled Crowd Machine.

103.   Crowd Machine did not launch its decentralized Cloud Computer, and it has not launched to date.

104.   Crowd Machine has experienced sweeping waves of repeated layoffs of employees beginning almost immediately after the Plaintiffs made their investment.

105.   Crowd Machine and Metavine have since opened offices in Sydney, Australia.

106.   In November 2019, Sproule also publicized himself to be joining an Australian Gold Mining firm called "Cradle Gold" as a director. Upon information and belief, he has diverted investment funds from Crowd Machine into this project.

## CLAIMS FOR RELIEF

## <u>FIRST CAUSE OF ACTION</u>

**VIOLATION OF SECTION 5 OF THE SECURITIES ACT BY FAILURE TO SECURE LAWFUL EXEMPTION FOR SECURITIES AND/OR TO REGISTER SECURITIES (Defendants Crowd Machine, Inc., Crowd Machine SEZC, and Metavine, Inc.)**

107.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint

108.   The SEC has provided clear guidance that cryptocurrency issuance for purposes of speculation, in the absence of a functioning cryptocurrency-

dependent business revenue stream, cannot be considered anything other than a security. The Crowd Machine tokens are therefore securities subject to the Securities Act.

109.    Under Section 5 of the Securities Act of 1933, as amended ("the Securities Act") [15 U.S.C. § 77e (1988)], all offers and sales of securities must be registered with the SEC or qualify for exemption from the registration requirements.

110.    Rule 502(d) further requires that the issuer "exercise reasonable care to assure that the purchasers of the securities are not underwriters within the meaning of section 2(a)(11) of the [Securities] Act." Ibid.   Demonstrating reasonable care requires, among other things, "[r]easonable inquiry to determine if the purchaser is acquiring the securities for himself or for other persons." Ibid.

111.    The stated purpose of the Crowd Machine private, pre-sale cryptocurrency offering was for investors, including the Plaintiffs, to profit by reselling the cryptocurrency tokens to the public, upon a later 'public sale' of the Crowd Machine cryptocurrency tokens.

112.    Crowd Machine, like so many other cryptocurrency offerings in late 2017 and early 2018,  attempted to deliberately and fraudulently flout section 502(d). They attempted to hide behind private offering memorandums. They sought out accredited investors to perpetuate this fraud.  Excessively prolific legal

disclosures were included to mask over this deception. They include waivers of investors protections, and mandatory arbitration provisions. These SAFT contracts were provided in order to obfuscate the obvious -, that no investor, accredited or otherwise  could legally be allowed to become an underwriter without proper registration in accord with the securities laws.

113.    Those behind Crowd Machine and other similar offerings knew that they were encouraging investors to become prohibited underwriters. They took further pains to incorporate offshore entities to further the goal of shielding prohibited issuances from the SEC and U.S. investor protection laws.

114.    Defendants explicitly enabled underwriting by marketing the tokens to initial 'private pre-sale' investors, as a general public resale investment with an 80% discount to the public par issuance price. Therefore, Defendants Crowd Machine, Crowd Machine SEZC and Metavine should have known that all investors in the CMCT were potential, even likely, underwriters. The CMCT cryptocurrency offering could never have satisfied §§ 502(d) and 2(a)(11).

115.    Defendants Crowd Machine, Crowd Machine SEZC and Metavine have continued to offer the CMCT tokens to date.  At no point has it registered the cryptocurrency  offering with the SEC.  Thus, Defendants Crowd Machine, Crowd Machine SEZC and Metavine have offered unregistered securities continuously.

116.    Pursuant to Section 12(a)(1) of the Securities Act, any breach of Section 5 gives rise to a strict liability claim for rescission of the full amount of the investment in the unregistered securities.   Defendants Crowd Machine, Crowd Machine SEZC and Metavine are all one and the same, and they are all liable accordingly for recission of the original investment.

## SECOND CAUSE OF ACTION

**VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10b-5 (Defendants Crowd Machine, Inc.,  Crowd Machine SEZC, And Metavine, Inc)**

117.    Plaintiffs hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

118.    Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b–5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security.

119.    Throughout the course of their cryptocurrency offering, Defendants individually and collectively made significant material misrepresentations regarding the Crowd Machine platform, both as to the extent it was already in use by major corporations,  its market valuation, its global support, and its revenue-producing capacity.  Plaintiffs relied on these representations in deciding to invest in the Crowd Machine cryptocurrency.

120.    The most frequently used fraudulent claim was that Crowd Machine "was already in use in Fortune 500 companies."  (The Whitepaper, p. 4.)  These supposedly included "General Electric, AON Hewitt KONE Anthem and Pacific Western Bank."  In fact, these companies never used Crowd Machine software or technology.

121.    Upon information and belief, Metavine may have had one contract signed with Anthem, and this contract was never transferred or otherwise sold to Crowd Machine Inc. ("Crowd Machine has already demonstrated its prowess with the early adoption of its product by Fortune 500 companies (via Metavine)").   It was a re-used cliché used to lure potential investors with an impression of legitimacy and importance well beyond reality and well beyond mere puffery. Upon information and belief no Crowd Machine software ever existed. Crowd Machine lacked any meaningful business plan and the White Paper was filled with jargonized buffoonery laid down to lure cryptocurrency investors into its orbit.

122.    The Defendants maintained they had built an extensive global network, but no such partnership network existed.   Crowd Machine had essentially one ostensible "global partner" at the time of these investments, with Cashaa – a partnership it announced in 2017 and again in 2018.  Crowd Machine has developed one known partnership since then (with Sapvix).

123.    The Defendants misrepresented the planned launch of the Crowd Machine platform.  Defendants repeatedly asserted the system was already in use, and was generating revenue, and would be fully launched by the last quarter of 2018.  Crowd Machine asserted it was in use in 73 countries.  It was not.  It claimed it was in use with "numerous large banking institutions."  It was not.  These were the same claims Sproule had made through Metavine in 2016.  They were no truer then as in 2018.  They made claims that their platform and "Crowd Computer" provides 'cloud computing' however, the platform is operating on AWS services.  According to the sources this was not true as the company in fact had no proprietary technology.  Additionally, the information reveals that the team behind the project was made up of executives with impressive biographies and that issued false or misleading marketing materials such as James Hanley's announcement of "partnership training " on May 2, 2019 with fictional entities.

124.    The Defendants misrepresented the fundamental ability of Crowd Machine to launch at all.  The announced, scheduled launch was a particularly egregious misrepresentation because in fact by 2018 Crowd Machine was already in significant decline.  In November of 2017, Sproule had widely advertised the addition to his management team of two Blockchain executives.  Ben Gorlick became Chief Technology Officer and Johnny Dilley Chief of System Architecture.  Both individuals left in a matter of months, under weakly hidden rumors of

mismanagement. See, e.g., "Crowd Machine CEO Craig Sproule Opens up on CMCT Theft," by Priyeshu Garg, <u>BTC Manager</u>, September 27, 2018 [at https://btcmanager.com/crowd-machine-ceo-craig-sproule-opens-up-on-cmct-theft/]. Kurt Pfluger, one of the named Defendants herein, similarly left shortly after assisting with the execution of the Plaintiffs' investments.

125.    Crowd Machine began to shed key management officials in early 2018.   One team advisor, an investor from the U.A.E., Saeed Al Darmaki, maintained quite publicly that Crowd Machine had failed to pay him $3 million due from his investment.  In September of 2018, Crowd Machine was hacked and lost a high volume of tokens.  It blamed its losses and failures upon this theft. This was also a lie. Crowd Machine was a fake project from the get-go; the supposed theft of tokens cannot explain away the misrepresentations that Crowd Machine made.

126.    Plaintiffs relied upon these misrepresentations.

127.    As a result of this reliance, Plaintiffs decided to invest into CMCT and the resulting losses are attributed to this investment.

128.    Plaintiffs' remedies are for a return of these losses as per the second cause of action.

## <u>THIRD CAUSE OF ACTION</u>

**VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT: CONTROL PERSON LIABILITY (Defendants Craig Sproule, Kurt Pfluger, and  Camden Dore, Ben Gorlick, James Hanley, Anne Osborne)**

129.    Plaintiffs hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

130.    The Act defines "Control Person" liability as a prohibition for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person.

131.    Defendants Craig Sproule, Kurt Pfluger, and  Camden Dore, James Hanley, and Anne Osborne (the "Control Person Defendants") by virtue of their offices, stock ownership, agency, agreements or understandings, specific acts, and for any other reason, were, at the time of the wrongs alleged herein, control persons within the meaning of Section 20(a) of the Exchange Act.

132.    The Control Person Defendants exercised their power and influence in regard to the Offering to cause the material misrepresentations and omissions as described herein.

133.    The Control Person Defendants, separately or together, possess, directly or indirectly, the power to direct or cause the direction of the management

and policies of Crowd Machine, Crowd Machine SEZC and Metavine  through their corporate management authorities.

134.   The Control Person Defendants, separately or together, were direct participants in making, and/or were made aware of the circumstances surrounding, the materially false and/or misleading representations and omissions regarding the Offering.

135.   As a direct and proximate result of the Control Person Defendants' wrongful conduct, Plaintiffs suffered damages from their investment in the Crowd Machine Tokens.

<u>**FOURTH CAUSE OF ACTION**</u>

**COMMON LAW FRAUD (Defendants Crowd Machine, Inc.,  Crowd Machine SEZC, and Metavine, Inc)**

136.   Plaintiffs  hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

137.   On January 19, 2018,  Defendants Crowd Machine, Inc.,  Crowd Machine SEZC, and Metavine, Inc entered into SAFT contracts for investment in their cryptocurrency offering.  The investors who directly or by proxy entered into these SAFT contracts, including Plaintiffs, relied on material corporate misrepresentations to decide to enter into these contracts.

138.    The contracts were devised not only to take advantage of knowingly selling unregistered securities with the purpose of publicly marketing unregistered securities, but they were devised to cover up the entire fraud, inclusive of the misrepresentations in the White Paper as to the basic premise of the company's business.

139.    As of the present,  no Crowd Machine platform launch has occurred.

140.    By the above conduct, Defendants Crowd Machine, Inc.,  Crowd Machine SEZC, and Metavine, Inc. engaged in fraudulent activity aimed inducing the Plaintiffs to invest in their company.

141.    Both Plaintiffs suffered damages as a result of this fraud and are entitled to compensation for these damages.

## FIFTH CAUSE OF ACTION

**UNREGISTERED UNDERWRITING AND OR BROKERING OF SECURITIES (Defendants Charlie Shrem and Roger Tichenor)**

142.    Section 15 of the Exchange Act of 1934 makes it unlawful for any broker or dealer to "effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security ... unless such broker or dealer is registered." [15 U.S. Code § 78o]. This registration requirement applies whether the transaction is exempt from the Securities Act or not. The SEC has noted that a broker who sells securities exempt from registration under Regulation D of the 1933 Act must still

register these securities. So-called "placement agents" are not exempt from broker-dealer registration and the requirements to which brokers are subject.

143.   Shrem actively solicited investors for well over a year, and pushed those who had already invested to do so again. He provided Plaintiff Bachiashvili with solicitation information regarding Crowd Machine's issuance. He never provided Plaintiff with any SAFT or other disclosure documentation.

144.   Upon information and belief, Shrem received commissions and/or other forms of  transaction based compensation, in the form of a reward of cryptocurrency tokens in return for completing the brokering transaction.

145.   Shrem was engaged in the business of effecting transactions in securities (exempt or otherwise) for the account of others and receiving commissions for his actions. He did not disclose this information to Plaintiff nor did he register these transactions with FINRA, the SEC or any other relevant entities.

146.   Shrem knew or should have known these securities were unregistered and that they would be trading on public markets as that was their intended purpose.

147.   Exchange Act Rule 3a4-1 provides that Shrem was therefore required to register as a broker for participating in the sale of securities sold by Crowd

Machine. He was also required to register that he was selling these specific securities with FINRA.

148.    Shrem was not registered or up-to-date with his FINRA registration requirements. Nor was he registered as a broker-dealer in Florida, New York, California or anywhere else Crowd Machine was operating or doing business, when Shrem accepted commissions for these securities transactions. Shrem did not register these transactions. Defendant Shrem thus violated Section 15(a)1 of the Exchange Act.

149.    Shrem was using Roger Tichnor as a Strawman or cooperating agent, to market an investment which ultimately was valued at $7.1 million dollars, through at least 50 other persons, and did this in conjunction and with the full knowledge of Craig Sproule. Shrem was on notice that he was perpetuating a massive investment fraud from the very minute he chose to use Roger Tichenor to help cover up the legal requirements for signing his name on a SAFT document for which he was the beneficiary.

150.    Upon information and belief, Crowd Machine and Craig Sproule knew of this violation and consented to Shrem's pooling of investment.

151.    The remedy listed under Section 29(b) of the Exchange act is rescission of the investment. Rescission is clearly warranted herein. Defendant

Shrem is also subject to disgorgement of "ill-gotten gains" (with pre-judgment interest) and third-tier civil penalties.

152.    As a direct and proximate result of Defendant Tichenor and Shrem's unlawful conduct, Plaintiff suffered damages in connection with his investment in the CMCT Tokens, specifically, the loss of $2,112,000.

## SIXTH CAUSE OF ACTION

**FRAUD ON THE MARKET (Defendants Bittrex, HitBtc, and Crowd Machine)**

153.    The Defendant Exchanges Bittrex and HitBtc listed Crowd Machine Tokens in April and May of 2018. This would not have been possible without Crowd Machine submitting a request for their tokens to be listed and submitting legal paperwork showing that Crowd Machine was offering an unregistered, exempted security in and from the United States.

154.    The Defendant Exchanges could never have engaged in any due diligence regarding this offering and instead acted as willing pay-to-play, Fraud As A Service (FAAS) pass-through vehicles for U.S. based securities fraud.

155.    The slightest diligence would have revealed that the CMCT tokens could not be used by Crowd Machine or any other buyers or sellers for any other purpose than speculation because No Crowd Machine platform existed, let alone any method of using the CMCT tokens to access such a Platform.

156.    The Defendant Exchanges thereby enabled a fraud on the market perpetuated by Crowd Machine by which their tokens could be offloaded onto a larger crowd of victims for their fraud.

157.    Plaintiff Bachiashvili bought approximately 554 Bitcoin worth of Crowd Machine Tokens on the HitBTC exchange and 374 Bitcoin worth of Crowd Machine tokens on Bittrex Exchange. He presently holds these tokens at a total loss of 928 Bitcoin. These purchase were made in both May and June 2018, with the total dollar equivalent amount netting to an investment of $7,331,200 in CMCT tokens through these exchanges.  Plaintiff  Bonayer purchased $125,000 worth of CMCT tokens in February of  2018, also now at full loss.

158.    As a result of the Defendant Crowd Machine's fraud upon the market, and their efforts to get these tokens listed on international Exchanges in the Seychelles and to sell these worthless tokens with these two Exchanges help, Plaintiff Bachiashvili has lost a total of  $7,331,200 Bitcoins - all as a result of Crowd Machine, Bitfinex, and BitHub's actions.  By the same conduct, Plaintiff  Bonayer has lost a total of $125,000.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs respectfully requests this Court to enter judgment against the Defendants as follows:

Declare that:

(a)     Defendants Crowd Machine, Inc.,   Crowd Machine SEZC, and Metavine, Inc. offered and sold unregistered securities in violation of Section 5 of the Securities Act;

(b)     The Crowd Machine SAFT Contracts be deemed void as of law;

(c)     The Crowd Machine SAFT Provision 7 regarding Mandatory Arbitration be nullified, to allow Charlie Shrem and Roger Tichnor to join the Defendant Crowd Machine into this litigation for the purpose of cross-claiming against them, and for the purpose of enabling the suit with Jason Bonayer to Proceed publicly.

Order:

(a)     Rescission of the unregistered securities investments made by Plaintiffs and/or compensatory damages for the Plaintiffs' investment loss in an amount of $125,000 for Jason Bonayer and an amount of  $2,112,000 for George Bachiashvili,  plus interest and legal fees or pre-judgment interest at the statutory rate of 9% under CPLR §§ 5001 & 5004;

(b)     Additional Investment Damages awarded in the amount of $4,376,600 from HitBtc, and $2,954,600 from Bittrex, or in the alternative, a total of $7,331,200 of damages from Defendant Crowd Machine.

(c)     the costs of this action, including reasonable attorneys' fees and disbursements; and grant such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated June 24, 2021.                    Respectfully submitted,

                                        **THE BONDERUD LAW FIRM, P.A.**

                                        _/s/ Andrew Bonderud_
                                        Andrew M. Bonderud, Esq.
                                        Florida Bar No. 0102178
                                        2130 Riverside Ave.
                                        Jacksonville, FL 32204
                                        (904) 438-8082 (Office)
                                        (904) 800-1482 (Facsimile)
                                        Andrew@jax.Lawyer
                                        Kinnette@Jax.Lawyer
                                        BonderudLaw@gmail.com
                                        _Counsel for Plaintiffs_